## Case No. 4,344.

**ELGEE'S ADM'R v. LOVELL.**

[1 Woolw. 102;[1] Rev. Cas. 72.]

Circuit Court, D. Missouri. Oct. Term, 1865.[2]

[1] [Reported by James W. Woolworth, Esq.]

[2] [See note at end of case.]

Glover & Shepley, for plaintiff.

Drake, Hughes, Broadhead, & Hill, for defendant.

MILLER, Circuit Justice. The second plea is evidently directed to the personal character of the plaintiff. It may be regarded as a denial of his right, either to bring any suit in this court, or to bring a suit for property found in an insurrectionary district.

Looked at in the first view, it is a plea in abatement, in analogy to the plea of alien enemy. As such it seeks to defeat this suit by the charge that the plaintiff is in the attitude towards the government, in whose courts he seeks relief, of an alien enemy in time of war. But the plea does not contain an averment that such was the character and status of the plaintiff when the suit was commenced. That is a necessary averment in such a plea. For want of it, the plea is bad. Chitty, in his approved forms, incorporates such an allegation (3 Chit. Pl. 911); and on this point, in Levine v. Taylor, 12 Mass. 8, it is said: "This disability resembles that arising from the outlawry of the plaintiff: as to which, if pleaded in disability, it is decided that if the cause of action accrues, or perhaps if the action is commenced whilst the plaintiff is thus disabled, the plea quite overthrows the writ; and after a pardon or reversal of the outlawry, the plaintiff must begin de novo. But if the disability occurs after the commencement of the action, it only suspends the proceeding quousque, &c.; and after the disability is removed, the plaintiff may recontinue the suit by re-summons or re-attachment. Accordingly, in several cases, where the action was commenced before the declaration of war, this court have expressed an opinion that it produced only a temporary disability; and, at their recommendation, the parties have agreed to continuances without costs on either side, in order to avoid the trouble and expense of new process at the termination of the war."

It is obvious from this, that when the effort is to avoid the suit altogether, the disability must exist at its commencement, for if it arise subsequently, the further prosecution is suspended merely until peace is restored. See Faulkland v. Stanion, 12 Mod. 400.

In an action on contract, the plea of alien enemy is good in bar, when it shows that the contract sued on was made in time of war with a public enemy, by a party in allegiance to the government in whose courts the suit is brought. Ex parte Boussmaker, 13 Ves. 71; Willison v. Patteson, 7 Taunt. 439.

It is insisted that this is an action on contract, because the declaration alleges a bailment by the plaintiff to the defendant to be re-delivered on demand, and a demand and refusal;—that therefore the plea is good in bar.

It is true that there are authorities holding that the action of detinue is sometimes treated as an action on contract; and it is no less certain that the allegations of the declaration set out in words a contract in bailment.

But without pursuing the authorities as to whether detinue is to be held an action on contract or in tort, it is sufficient to say, that it is often brought for a tort; and we think it would be straining the technical point beyond its just use, to hold the plaintiff to the literal meaning of the words of his declaration. The form of words, like that in trover and ejectment, is purely artificial and conventional, and is never required to be proved as laid. It being clear, from all that appears in this case, that the suit is grounded on a tortious seizure by the defendant of the property mentioned, we will not hold, on this demurrer, contrary to the fact, that the plaintiff has sued upon a contract, because, by the

rules of pleading, he has been compelled to use a fictitious form.

Viewing the case as in tort, the question has been asked and discussed. whether a public enemy can sustain an action in our courts for any trespass committed in his country, in time of war, by one owning allegiance to our government. It is unnecessary to decide this question here. It is claimed that section 6 of the act of July 17, 1862 (12 Stat. 591), commonly called the "Confiscation Act," is decisive of the question raised on this plea. That act provides that the property of certain individuals may be seized by the president, or under his orders, and turned over to the courts, which shall, by a regular judicial proceeding, confiscate and sell the same. The closing provision of the 6th section alluded to, reads thus: "And it shall be a sufficient bar to any suit brought by such person for the possession or use of such property, or any of it, to allege and prove that he is one of the persons described in this section."

Assuming that the plaintiff is shown to be one of the persons described in that section which is doubtful, we are of opinion that the bar applies only to property seized under that act, and to no other. This is apparent from the terms of the section. Provision is made for the seizure of the property, and for a judicial proceeding for its condemnation; and then follows the clause giving a bar to the proceeding. The bar could be alleged and pleaded only to a suit to condemn property seized under the act. There is no allegation here that this property was seized under the confiscation act, or that the defendant had any purpose to libel it in any court for condemnation.

On the whole, the defendant having expressed a wish to amend this plea, so far as to make the allegation of the plaintiff's character apply to the time of the bringing of this suit, he is permitted to do so now; and such amendment being made the demurrer to that plea will be overruled.

The third plea is based on the act of March 3, 1863 (12 Stat. 820), which provides, that the special agent may "receive and collect all abandoned or captured property in any state or territory, or any portion of any state or territory, of the United States, designated as in insurrection against the lawful government of the United States, by the proclamation of the president of July 1, 1862." In order to show his right under this act. the agent must show that the property was taken by him in a district which had been designated as in insurrection. This plea does not contain such averment, and is therefore bad.

The fourth plea is bad, because, while the general property in the cotton may be in the United States, this fact does not exclude the idea of such a special property, with present right of possession in the plaintiff, as may enable him to sustain the action.

The fifth plea presents the main ground of defence on the merits, if the personal status of the plaintiff is such that he can bring his suit in this court. It contains a full statement of the facts in the case. It shows that the cotton mentioned in the declaration was seized as abandoned property in one of the districts declared by the proclamation to be in a state of insurrection, by a special agent of the treasury department for that district; and that, when this suit was brought, it was held by the defendant as an agent of the government, with the view of disposing of it under the act.

The objection taken to it is, that it does not aver that the property, when taken possession of by the treasury agent, was captured or abandoned property. nor in any other manner show that it was rightfully seized.

Much and able argument has been presented on both sides of this issue, drawn from considerations of the powers possessed by military and civil officers in an enemy's country; the general policy of the government in reference to permitting suits to be brought to recover property in the hands of its revenue officers; and from the construction of the act of March 2, 1832 (4 Stat. 632), as applicable to this case. But the majority of this court are of opinion that the solution of the question must be found in the just construction of the act under which the treasury agent proceeded, namely, the act of March 3, 1863 (12 Stat. 820).

This statute enacts, that property in any of the states, or parts of states, the inhabitants of which are declared to be in insurrection, which has been captured by our military forces, or been abandoned by its owner, shall be taken possession of by special agents of the treasury department. appointed for that purpose, and may be used by the United States, after appraisal, for any of its purposes, or sold, and the proceeds of the sale deposited in the treasury. Section 3 of the act, after providing that such agents shall give bond, with such securities, and in such amounts, and as often, as the secretary may require, and keep, in proper books, accounts of all their transactions, adds: "And any person claiming to have been the owner of any such abandoned or captured property, may, at any time within two years after the suppression of the Rebellion, prefer his claim to the proceeds thereof, in the court of claims; and on proof to the satisfaction of said court of his ownership of said property, to his right to the proceeds thereof, and that he has never given any aid or comfort to the present Rebellion, to receive the residue of such proceeds, after the deduction of any purchase money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof."

The question is, whether congress intended to make the remedy given by this act exclusive of all others, or to permit the treas-

ury agents to be sued for the possession of proceeds of such property wherever the party aggrieved might find a court of general jurisdiction.

The hardships, on the one hand, of allowing these agents, without liability to the law, at their discretion, to seize upon any property anywhere in these insurrectionary districts; and, on the other hand, of subjecting persons in their situation to be harassed by litigation at the hands of every person claiming an interest in the property, have been forcibly urged upon us. It is not inappropriate to remark, that their functions were to be exercised, so far as the seizure of property was concerned, in an enemy's country. They were vested with almost unlimited powers over all the property in the designated districts. They could take, and hold, and proceed against, whatever they, in the exercise of their arbitrary judgment, saw fit to seize. All that, on behalf of the plaintiff, has been urged in this regard is very true. But if, in the exercise of functions so delicate and so odious, in an enemy's country, surrounded by hostile inhabitants, they were to have every step in their proceedings tested by the courts of law, the expenses of judicial proceedings imposed upon them, and the delays incident thereto interposed, their office would be practically useless, and few men of responsibility would be willing to accept it. The very considerations urged for the plaintiff, go to show that the remedy prescribed by the law was intended to be exclusive.

Another circumstance of their situation, which should be noted, is this, that they were to discharge these duties not only in an enemy's country, but in such parts thereof as had been overrun, and were then held by our military forces. While these forces were in the occupancy of any section of country, all the movable property therein would necessarily be liable to destruction by the soldiers. And when the army advanced to other lines, the yet more lawless mob were left to depredate upon what should remain. Under such circumstances, it could be no great hardship—on the other hand, it might be the best and the only protection to the owner—to have an authorized agent of the government intervene, and take and preserve the property, to be restored at a proper time and under proper circumstances. Congress saw fit to prescribe that time and those circumstances in the act, evidently intending to exclude all other means of determining them.

The act evidently contemplates that, in some instances at least, property will be seized which ought to be returned to its owner, or for which compensation should be made by paying him the proceeds. Otherwise it were unnecessary to provide any means of determining when a return should be made. And the remedy applies to property taken by mistake, or by the unjusti-fiable act of the agent, equally as to property which has been abandoned or captured. It is equally appropriate and necessary. Indeed, the just occasion for it is greater. It is answered, with much ingenuity, that the remedy is by petition in the court of claims, and that, in fact, the whole act assumes that it is only captured or abandoned property which, or the proceeds of which, may be recovered by that process; that, beyond the definite limits set by those terms, the remedy has no application. But this I think is sticking in the bark. It does not meet the fact patent upon the act, that, by means of the remedy which it provides, an inquiry whether the property is abandoned or captured is to be made, in order to determine whether a return should be awarded.

There is yet another view which may be taken. The proceeds of property seized by the agent are to be deposited with the treasury, where, for the time limited, they may be said to await the claimant who shall show himself entitled thereto. The act makes the government a holder of the property, or its proceeds, as a trustee for such party. A proceeding of some sort against the government is necessary to compel it to surrender the property which it thus holds in trust. But it cannot be sued for this, or any other matter, unless it authorize the proceeding against it. Of course it may, in its grant of such authority, prescribe the manner and the court in which it shall be called to account; and that manner must be pursued in the tribunal provided. That is what congress has done here. It has authorized a suit against the government, to be prosecuted by petition in the court of claims. That is the situation in respect of the proceeds of property which has been sold. And whatever may be said in that respect, is equally true of the property when in the hands of the agent. To suppose that congress sent forth its civil agents into a hostile country to perform these delicate functions, and left them liable to actions for damages in any court within whose territorial jurisdiction they might chance at any time to be, and at the same time provided a forum and a rule by which what it considers right in the premises may be determined, is a reflection on that body, which, in this case, I do not think it deserves.

I have not noticed the fact that the statute provides that a bond, with abundant security, is to be given by the agent, because it is somewhat aside from this inquiry. It may be that, in the case of an arbitrary exercise of authority over property not liable to seizure, under color of the law, the agent's bond might be sued by the government for the use of the injured citizen. But upon that, I need not here remark.

I am of opinion that congress intended to prescribe to all claimants, who should prove their loyalty and their right to the property,

this remedy for all cases of seizure by agents under this law, whether made in strict accordance with its provisions or not; and also, that this should be the exclusive remedy in such cases, unless, perhaps, in some cases, a suit might be maintained on the official bond.

The demurrer to this plea is overruled.

At a subsequent day in the term, the plaintiff filed replications to the second and fifth pleas. To these replications, demurrers were interposed, which, being argued by the learned counsel who had argued the questions raised before, were decided by the court.

MILLER, Circuit Justice. The act of March 3, 1863, evidently contemplates that property of loyal citizens might and would be taken under it; for the provision for claimants asserting their rights in the court of claims is restricted to such persons as can prove that they have "never given any aid or comfort to the present Rebellion." Such persons never having been guilty of any offence against the government, need no pardon, and are surely in as good condition as pardoned traitors.

Property seized by a treasury agent in an insurrectionary district, as abandoned property, may be owned by a loyal citizen of a loyal state; and yet his only remedy is an application to the court of claims. The amnesty of the president was not intended to, nor could it, place a man who has committed treason in a better situation, in reference to property so seized, than a loyal citizen of a loyal state. This replication is therefore bad as an answer to the fifth plea.

Does the act remove the disability to sue which is set forth in the second plea? This plea is not founded on any act of congress, nor on any law growing out of our state or national jurisprudence. It is based on a principle of the law of nations, recognized and enforced in all civilized countries, that, in time of war, an enemy cannot sue in the courts of the country with which his nation is belligerent. This grows out of the principle, that all persons, citizens or subjects of the nations thus at war, are themselves enemies each to the other. In the war of the current rebellion, this principle has been extended to all the citizens of the rebellious states found inside of the so-called "Confederate Lines." The Prize Cases, 2 Black [67 U. S.] 635; Mrs. Alexander's Cotton, 2 Wall. [69 U. S.] 404.

According to this principle, a man residing in the Confederacy, and subject to its control, is, in law, a public enemy, although he may have committed no act of disloyalty. He is so far a public enemy that, while the war is flagrant, his property found on the high seas is lawful prize of war; and that he cannot, in our courts, maintain any suit against citizens residing in loyal states. These are disadvantages imposed upon him by the law of nations, and not by our local, or national legislation. And as no proclamation of the president can change or modify this law, I doubt very much whether it can relieve any party from the disabilities which it imposes. This disability is independent of any personal guilt, and grows out of no violation of any criminal statute. The right of the president to pardon for all offences against the laws of congress, to extend amnesty where there has been personal guilt, is not questioned. Whatever his power, I have no idea that he intended to do more than this. He did not purpose to place the parties who should avail themselves of this proclamation in any better position than those who, residing in the insurrectionary districts, had always maintained their allegiance to the federal government.

Such persons need no pardon. In by judgment, all their rights of property and person are at once restored when the war ceases. The disabilities under which they lay were imposed, not by reason of their personal guilt, but were necessities of the Civil War. When those necessities ceased, their disabilities ceased, in all courts, and in all places. Being without guilt, they need no pardon. On the contrary, they merit the gratitude of the government and of the people. It is absurd to suppose that the president, if he had the power, would have the wish, to place traitors in a better posture than that in which loyal persons stand.

That the plaintiff, after taking the oath of allegiance, became a loyal citizen, and, at the time of bringing his suit, was under no disability from residence, may be true; but these replications do not show it, and are therefore bad.

The demurrer is sustained. Demurrer sustained.

Judgment was ordered on these demurrers for the defendant, and the judgment afterwards affirmed in the supreme court by an equal division of the judges.